Jonathan M. Cohen (SBN: 168207)
Martin Sabelli (SBN: 164772)
Robyn T. Callahan (SBN: 225472)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111-5894
Telephone:    415-591-1000
Facsimile:    415-591-1400
Email: jcohen@winston.com
rcallahan@winston.com

Attorneys for Plaintiff
FRANK NEMIROFSKY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| FRANK NEMIROFSKY,<br><br>    Plaintiff,<br><br>vs.<br><br>SEOK KI KIM; STV ASIA, LTD. a British Virgin Islands corporation; and DOES 1 through 20, inclusive,<br><br>    Defendants. | Case No. 3:07-CV-02769 – JL<br>Hon. Magistrate James Larson<br><br>**PLAINTIFF FRANK NEMIROFSKY'S *EX PARTE* MOTION TO EXTEND THE TEMPORARY PROTECTIVE ORDER**<br><br>**REDACTED COPY**<br>**FILED UNDER SEAL** |

Plaintiff FRANK NEMIROFSKY ("Plaintiff" or "Mr. Nemirofsky") brings this *Ex Parte* Motion to extend the Temporary Protective Order ("TPO") initially issued on May 16, 2007, under which disputed settlement funds are being held in a client trust account at the law firm Squire, Sanders & Dempsey LLP. The TPO is due to expire on June 26, 2007. However, there still exists an ongoing dispute as to the disbursement of the settlement funds and Plaintiff respectfully requests that the Court maintain the status quo until at least July 25, 2007 when Defendants' motion to modify or vacate is set to be heard and allow time for the parties to conduct some preliminary discovery on the factual issues.

/ / /

For the reasons set forth herein, Plaintiff has demonstrated good cause for shortened time on his request for an extension of the TPO.

## I.

## **PROCEDURAL BACKGROUND**

Plaintiff FRANK NEMIROFSKY ("Plaintiff" or "Mr. Nemirofsky") filed a Complaint in the San Francisco Superior Court on May 16, 2007 (Case No. CV-07-463428) for breach of contract, fraud, conversion and breach of fiduciary duty against Defendants SEOK KI KIM and STV ASIA, Ltd. (collectively referred to as "Defendants" or "KIM" (Declaration of Jonathan M. Cohen ("Cohen Decl."), ¶2 and Exb. A).

On May 16, 2007, Plaintiff also filed an Ex Parte Application for a Right to Attach Order and Order for Issuance of a Writ of Attachment. (Cohen Decl., ¶3). Upon review of Plaintiff's Ex Parte Application, the Honorable Bruce E. Chan, found that the requirements set forth in California <u>Code of Civil Procedure</u> Section 485.220 were satisfied, and issued a Temporary Protective Order instructing Squire, Sanders & Dempsey LLP not to transfer, directly or indirectly, to anyone, the settlement proceeds from a case entitled <u>STV Asia Ltd. v. PRN Corporation and Best Buy Company, Inc.</u> which was venued in the U.S. District Court for the Northern District of California (Case No. C06-1664-JCS). (Cohen Decl., ¶4 and Exb. B). It appears that pursuant to Judge Chan's Order, the settlement proceeds are being held by Squire, Sanders & Dempsey in a client trust account, although neither Defense counsel, nor Squire, Sanders has confirmed this with Plaintiff or his counsel. (Cohen Decl., ¶4 and Exb. B).

On May 25, 2007, Defendants removed this case to the Northern District Court. Shortly thereafter (and without providing requisite notice to Plaintiff), Defendants filed an Ex Parte Application to Vacate or Modify the Temporary Protective Order. (Cohen Decl., ¶5). The hearing on Defendants' Ex Parte Motion is scheduled for July 25, 2007 at 9:30 a.m. (Cohen Decl., ¶5).

Plaintiff contacted Defendants' counsel, Seth Appel, by telephone on the morning of June 22, 2007 and gave notice of the filing of this Ex Parte Motion to Defendants. (Cohen Decl., ¶6).

///

## II.

## FACTUAL BACKGROUND

This case arises from Defendant Kim's breach of an agreement he made with Plaintiff Nemirofsky regarding their partnership in the litigation of <u>STV Asia Ltd. v. PRN Corporation and Best Buy Company, Inc.</u> ("PRN Litigation") and the distribution of the funds following the resolution of the PRN Litigation. (Declaration of Frank R. Nemirofsky ("Nemirofsky Decl."), ¶3).

### A.   Background of the Business Relationship Between Kim and Nemirofsky.

Defendant Kim and Plaintiff Nemirofsky's business relationship began in or about 1991 when Mr. Kim purportedly became an investor in NBL Communications, Inc. ("NBL"), the company co-founded by Mr. Nemirofsky. (Nemirofsky Decl., ¶4). While Mr. Nemirofsky was part of NBL, he agreed to assign his rights in an invention which allows video programs to be transmitted from a distribution center to a multitude of receiving sites, specifically patent no. 5,412,416[1] ("416 Video Media Distribution Patent") to NBL. (Nemirofsky Decl., ¶6). The assignment was contingent on his ongoing partnership in NBL and in exchange for the stock ownership that he was supposed to have in NBL (Nemirofsky Decl., ¶6). However, after the assignment, Mr. Nemirofsky was fired without cause by Mr. Kim. (Nemirofsky Decl., ¶6).

Thereafter, in September of 1993, Mr. Nemirofsky was contacted by NBL, through Mr. Kim and J.H. Choi (the CEO that Mr. Kim hand-picked), and was asked to become "partners" with them to restructure NBL and to develop the StoreTelevision ("STV") Network, which would later become the basis for the creation of STV Asia Ltd. (Nemirofsky Decl., ¶5). Mr. Nemirofsky agreed to return to NBL as the Chairman of the Company under the terms of his original October 1991 Contract. (Nemirofsky Decl., ¶5). A temporary consulting agreement was put in place and Mr. Nemirofsky's returned to work for NBL. (Nemirofsky Decl., ¶5). In reliance upon ongoing promises from Mr. Choi and Mr. Kim, Mr. Nemirofsky continued to work pursuant to his consulting agreement

---

[1] Prior to working for NBL Mr. Nemirofsky invented technology for which the U.S. Patent and Trademark Office issued U.S. Patent No. 5,412,416 ("416 Video Media Patent") on May 2, 1995 to Mr. Nemirofsky exclusively for a unique "Video Media Distribution Network Apparatus and Method" which allows video programs to be transmitted from a distribution center to a multitude of receiving sites, typically retail stores, dispersed over a wide geographic area. (Nemirofsky Decl., ¶ 6).

awaiting the long-term executive compensation agreement which he had been promised by Mr. Kim as a condition of his return to NBL. (Nemirofsky Decl., ¶5). However, the long-term employment agreement was never put in place. (Nemirofsky Decl., ¶5).

During the time that Mr. Nemirofsky was working for NBL pursuant to the consulting agreement, he invented the technology which became patented as U.S. Patent No. 5,983,069[2] ("069 Purchase Video Patent"). (Nemirofsky Decl., ¶7).

**REDACTED**

**B.    Background Regarding the PRN Case.**

On March 2, 2006, at Mr. Kim's direction, after a joint decision was made with Mr. Nemirofsky, STV Asia, Ltd.[4] filed a patent infringement suit against PRN Corporation and Best Buy Company, Inc. regarding the 069 Purchase Video Patent and the 416 Video Media Distribution Patent (Nemirofsky Decl., ¶8). Several months before the suit was filed Mr. Kim contacted Mr. Nemirofsky and asked him to be a "partner" in the litigation against PRN. (Nemirofsky Decl., ¶8). Mr. Kim, lacking the operational, technical and intellectual property knowledge and expertise regarding the patents at issue in the infringement action, needed Mr. Nemirofsky's expertise and

---

[2] On November 9, 1999, the U.S. Patent and Trademark Office issued U.S. Patent No. 5,983,069 entitled, "Point of Purchase Video Distribution System" ("069 Purchase Video Patent"). Mr. Nemirofsky was instrumental in obtaining this patent and is knowledgeable about this patent. (Nemirofsky Decl., ¶7).
[3] Plaintiff intends to file an amended complaint regarding his patent rights.
[4] STV Asia, Ltd. is incorporated in the British Virgin Islands and its principal place of business in is Hong Kong. (Nemirofsky Decl., ¶8).

4

PLAINTIFF FRANK NEMIROFSKY'S *EX PARTE* MOTION TO EXTEND THE TPO
Case No. 3:07-CV-02769 – JL

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5894

advice in order to prosecute the PRN patent litigation. (Nemirofsky Decl., ¶8). Mr. Kim asked Mr. Nemirofsky to "take the lead" in working with litigation counsel on the PRN litigation. (Nemirofsky Decl., ¶8). Mr. Nemirofsky viewed this as an opportunity to recoup the money that he is still owed from his past business dealings with Mr. Kim and the work he did for NBL. (Nemirofsky Decl., ¶8).

At the outset, Mr. Kim explained, and Mr. Nemirofsky agreed, that Mr. Nemirofsky's work on the PRN litigation would be on a limited, as needed basis totaling only two to three hours per week on average. (Nermirofsky Decl., ¶9). As such, prior to the filing of the patent infringement suit, Mr. Kim and Mr. Nemirofsky entered into an oral agreement whereby Mr. Nemirofsky agreed to provide business, operational and technical advice and assistance to Defendants and their litigation counsel in the PRN litigation in exchange for fifteen (15%) of the net recovery from PRN (after reimbursement of the costs of the expenses of the litigation). (Nemirofsky Decl., ¶9).

From the outset of the PRN litigation, Mr. Nemirofsky spent significantly more time[5] working on the case than what was estimated or asked of him by Mr. Kim. (Nemirofsky Decl., ¶10). In or about October of 2006, Mr. Kim and Mr. Nemirofsky met at Kirkpatrick & Lockhart's San Francisco office to discuss the status of the litigation, at which time they also notified their attorneys about the modification to their agreement. (Nemirofsky Decl., ¶11). Mr. Nemirofsky and Mr. Kim had agreed that in consideration of the excess time which Mr. Nemirofsky had already worked, as well as his ongoing time commitment and the need for his technical and operational expertise, Mr. Nemirofsky was entitled to a larger share of any proceeds from the PRN litigation. (Nemirofsky Decl., ¶11). Mr. Kim modified his agreement with Mr. Nemirofsky such that Mr. Nemirofsky's share of the PRN litigation proceeds would be raised from fifteen percent (15%) to fifty percent (50%)[6]. (Nemirofsky Decl., ¶11 and Exb. B; Cohen Decl., ¶7). The agreement was confirmed in the October 9, 2006 letter from Mr. Nemirofsky to Mr. Kim which Mr. Nemirofsky gave to Mr. Kim at the October 2006 meeting. (Nemirofsky Decl., ¶11). STV Asia's then attorney, Deborah Bailey-Wells, witnessed Mr. Kim's agreement to the increased 50% share for Mr. Nemirofsky and saw Mr.

---

[5] In fact, Mr. Nemirofsky has spent more than 2,500 hours working on the PRN litigation pursuant to his agreement with Mr. Kim. (Nemirofsky Decl., ¶10).
[6] This modification did not change the earlier agreement that the costs and expenses of the litigation would first be deducted from the total settlement or verdict proceeds of the PRN litigation.

Nemirofsky hand the confirming letter to Mr. Kim. (Nemirofsky Decl., ¶11; Cohen Decl., ¶7).

C. **Background Regarding <u>Nemirofsky v. Kim and STV Asia, Ltd.</u>**

The PRN litigation was ultimately settled at mediation in April and May of 2007. (Nemirofsky Decl., ¶12). Both Mr. Kim and Mr. Nemirofsky attended the mediation. (Nemirofsky Decl., ¶12). As of the date of the mediation, Mr. Nemirofsky held the position of a director of STV Asia. (Nemirofsky Decl., ¶12 and Exb. C). Although Mr. Nemirofsky, as a director of STV Asia, was initially told that he was to be a signator in of the settlement agreement, he was apparently removed as a director prior to the final signing and his name was taken off the signature blocks of the final settlement agreement. (Nemirofsky Decl., ¶12 and Exb. I).

Subsequently, Mr. Nemirofsky learned from Jim Smith, the attorney who represented STV Asia in the mediation, that as of May 7, 2007 (prior to the date the final settlement agreement was executed), Mr. Nemirofsky had been removed as a director of STV Asia. (Nemirofsky Decl., ¶13).

On May 9, 2007, Mr. Kim emailed Mr. Nemirofsky detailing "[their] mutual understanding" as to the division of the settlement proceeds noting that Mr. Nemirofsky's disbursement was fifteen percent (15%). (Nemirofsky Decl., ¶14). This law suit ensued.

In Mr. Kim's Declaration filed in support of Defendants' Ex Parte Motion, Mr. Kim not only renounces Mr. Nemirofsky's right to 50% of the PRN litigation proceeds, but is also now contesting that Mr. Nemirofsky is entitled to the initially agreed upon 15%. (See Declaration of Seok Ki Kim In Support of Ex Parte Application for Order Vacating or Modifying the TPO). As set forth above, this is not the first time that Mr. Kim has disavowed himself of agreements and promises to Mr. Nemirofsky through his deceitful practices.

**REDACTED**

# REDACTED

## III.
## AUTHORITY

### A. Ex Parte Relief Is Proper.

Ex parte orders are proper in situations such as for scheduling matters and in emergencies "such as motions to shorten time for hearing or to regulate the order of discovery procedures" or where "the delay caused by notifying the opposing party of the motion, or action the opposing party may take after learning of the motion, may itself defeat the purpose of the motion." *The Rutter Group,* Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 12-F, 12:162.

For purposes of *ex parte* applications, examples of "good cause" include situations where:

1) "a real emergency exists, threatening immediate and irreparable injury before the adverse party can be heard in opposition (e.g. temporary restraining orders under FRCP (65(b)); or

2) there is danger that, if given notice, the opposing party will flee or destroy evidence or hide assets…" Id.

### B. The Court Has Authority to Extend the TPO.

Section 486.100 provides in pertinent part that:

> "[T]he court may modify or vacate the temporary protective order if it determines that such action would be in the interest of justice and equity to the parties…"

Section 486.020 further states that upon examination of an *ex parte* application and supporting affidavit, the court "shall issue a temporary protective order…if it finds the following:

(a) The claim upon which the application for attachment is based is one upon which an attachment may be issued.

(b) The plaintiff has established the probable validity of the claim upon which the application for the attachment is based.

(c) The plaintiff will suffer great or irreparable injury...if the temporary protective order is not issued." Cal. Civ. Proc. Code § 486.020.

For purposes of a temporary protective order, "irreparable injury" as described in Section 486.020(d) is given the same meaning as in the context of a right to attach order.

The requirement of "irreparable injury," is satisfied if, "[u]nder the circumstances of the case, it may be inferred that there is a danger that the property sought to be attached would be concealed, substantially impaired in value, or otherwise made unavailable to levy if issuance of the order were delayed until the matter could be heard on notice." Cal. Code of Civ. Proc. § 485.010(b)(1).

## IV.

## PLAINTIFF'S *EX PARTE* APPLICATION TO EXTEND THE TPO SHOULD BE GRANTED

**A.    "Good Cause" Exists Justifying Immediate Action By the Court.**

"Good cause" for *ex parte* relief exists due to the very real potential that if the TPO is allowed to expire as scheduled on Tuesday, June 26, 2007, before such time as this Court has an opportunity to address Plaintiff's Motion for a Right to Attachment[7] and Defendants' Motion to Vacate or Modify the Temporary Protective Order, (which is currently set for hearing on July 25, 2007), Defendants may move the PRN litigation settlement proceeds to an off-shore account(s), hide or conceal said account(s), or disperse the funds. As described below, this leads to "a real emergency...threatening immediate and irreparable injury before the adverse party can be heard in opposition." *The Rutter Group*, Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 12-F, 12:166-170.1. Ex parte relief is intended for this very situation.

Plaintiff will be filing an Application for the Right to Attachment of the settlement proceeds, but does not have sufficient time to file and have the Application heard by this Court before the TPO expires on June 26, 2007. As the Court is aware, shortly after Plaintiff's action was filed in San

---

[7] Plaintiff intends to file a Right to Attach Motion.

Francisco Superior Court, Defendants removed the case to the Northern District. During the time period that Defendants filed their Ex Parte Application to Modify or Vacate the TPO, Plaintiff was in the process of transferring this case from Bowles & Verna to Winston & Strawn. (Nemirofsky Decl., ¶15). It took a couple of weeks for Winston & Strawn to obtain the files and get up to speed in this case. (Cohen Decl., ¶8). Moreover, as Winston & Strawn has been reviewing the files and analyzing the issues, it has become apparent that there are a number of factual matters which must be addressed through early discovery before the court can rule on the underlying substantive issue regarding whether an attachment of the settlement proceeds is proper and in what amount.

**B.    An Extension of the TPO is proper as Judge Chan Has Already Found that Plaintiff Meets Each of the Requisite Factors for a TPO.**

Plaintiff sufficiently set forth grounds for the issuance of the TPO in his Application filed and granted by the Superior Court.

1.    <u>Attachment May Be Issued On a Contract Claim.</u>

Plaintiff's claim against Defendants arises from an express contract and Defendants' failure to honor their obligations under the agreement regarding the division of the PRN litigation settlement proceeds. (Nemirofsky Decl., ¶¶ 11-14 and Cohen Decl., Exb. A). Because this is a contractual action and based upon claims for an ascertainable sum of money in an amount in excess of $500 attachment is proper under Cal. Code Civ. Pro. § 483.010.

2.    <u>It Is More Likely Than Not Plaintiff Will Prevail on the Contract.</u>

Despite Defendants' recent Ex Parte Application to Modify the TPO, Defendant Kim admitted in his May 9, 2007 email correspondence that Mr. Nemirofsky is owed a portion of the PRN litigation settlement proceeds.[8] (Nemirofsky Decl., Exb. D). Thus, it is more probable than not that Plaintiff will prevail on his breach of contract action. Given Mr. Kim's email, which amounts to an admission, there is no issue as to Mr. Kim's liability. As such, the only possible issue will be with respect to the amount of damages which Plaintiff is owed. However, in order to satisfy this element,

---

[8] Notably, even though Mr. Kim is now taking issue with the quality of Mr. Nemirofsky's performance of his obligations under their agreement, Mr. Kim's allegations are specious given that they did not arise until <u>after</u> Mr. Nemirofsky filed this law suit.

it is not necessary to show how much plaintiff will likely recover in damages, only that plaintiff is likely to prevail on the contract claim.

In addition,

**REDACTED**

3. <u>Plaintiff Will Suffer Irreparable Injury If Defendants are Given Access to the Settlement Proceeds.</u>

"Irreparable injury" can be demonstrated by any one of the five circumstances as delineated under C.C.P. Section 485.010(b). Plaintiff actually meets at least two of the circumstances as follows: (1) there is an inference that there is a danger the property which Plaintiff seeks to attach will be concealed or otherwise made unavailable, or its value will diminish substantively by the time a judgment is rendered; and (2) there is an inference that Defendants have not paid the debt at issue in the instant action and that Defendants are not generally paying the debt.

Although the papers filed in support of Plaintiff's initial application address the potential risk in allowing the settlement funds to be transferred to Defendants, what is not readily apparent from Plaintiff's initial application is the long-term business dealings between Mr. Kim and Mr. Nemirofsky and the numerous examples of deceitful practices by Mr. Kim. As detailed in the Nemirofsky Declaration filed in conjunction with this Motion, Plaintiff establishes that Mr. Kim has demonstrated a pattern of dishonest practices, not the least of which was Mr. Kim's offer to "hold" Mr. Nemirofsky's share of the settlement proceeds in an off-shore account so that Mr. Nemirofsky could avoid paying taxes and reporting said proceeds. (Nemirofsky Decl., ¶16).

In further support of Mr. Kim's failure to pay his debts is the fact that he was in serious arrears to Kirkpatrick & Lockhart with respect to the legal fees he owed in conjunction with their representation of STV Asia in the PRN litigation. The outstanding attorneys' fees and legal costs

were as high as $762,823.50 as of November 22, 2006. (Nemirofsky Decl., ¶18).

Throughout the fifteen-years of business dealings between Plaintiff and Mr. Kim, Defendant Kim has acted in bad faith, breached agreements, disavowed his obligations under agreements and refused to pay his debts. (Nemirofsky Decl., ¶¶4-7 and 11-14). Most recently, Mr. Kim had Mr. Nemirofsky removed as a director of STV Asia (without any notice to Mr. Nemirofsky) in order to exclude Mr. Nemirofsky as a signator to the final PRN settlement agreement and attempt to evade his obligations to pay Mr. Nemirofsky the full amount of the settlement proceeds to which he is entitled. (Nemirofsky Decl., ¶¶12-13)

Given Defendant Kim's past actions, coupled with his recent deceptive actions give rise to further inferences of dishonest practices which necessitate judicial intervention. It is clear that Defendants are willing to take whatever measures are necessary in furtherance of their intent to deprive Plaintiff of the money he is owed. Absent a Court Order extending the TPO, there is nothing preventing Defendants from taking further affirmative steps to avoid their financial obligations such that there is a real danger that Defendants will try to conceal or move their assets off-shore and retreat to Hong Kong, South Korea or some other unknown location to escape the jurisdiction of this Court. Doing so will irreparably injure Plaintiff.

**C.     If the Court Allows the TPO to Expire, Plaintiff Faces Substantial Risk, While the Requested Relief Poses No Harm to Defendants.**

Even if, *assuming arguendo*, this Court has doubts as to the amount actually owed to Plaintiff under the agreement, extending the Temporary Protective Order is reasonable until such time as the Court can address the substantive arguments.[9] Plaintiff is simply asking the Court to maintain the status quo until the parties are given an opportunity to fully brief the issues and the Court can consider all of the evidence. Given that the settlement funds have been held in trust to date with no evidence of having caused any harm to Defendants, a brief extension of the TPO is of little consequence to Defendants, but the release of funds is of great risk to Plaintiff. Moreover, the funds

---

[9] While Judge Chan did not require an undertaking upon the issuance of the TPO, Mr. Nemirofsky is prepared to post the $10,000 bond provided for under Cal. Civ. Proc. Code on July 27, 2007 if this Court extends the TPO. (Nemirofsky Decl., ¶19).

at issue have no bearing on the continual operations of STV Asia and poses no financial harm to Defendants given the nature of the claims that gave rise to the settlement funds (i.e. Defendants are not out-of-pocket).

## V.

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that this Court grant his *Ex Parte* Motion and extend the Temporary Protective Order whereby Squire, Sanders, is prohibited from releasing the settlement funds to Defendants. Based upon the foregoing, the requested alternative relief of reissuing the TPO is likewise appropriate.

Dated: June 22, 2007

WINSTON & STRAWN LLP

By: _____
Jonathan M. Cohen
Robyn T. Callahan
WINSTON & STRAWN LLP
Attorneys for Plaintiff
FRANK NEMIROFSKY

SF:175745.1